This is an opportunity that 17-Has 0-5-6-7 to stay in the camp of Kendall, can be used by several Arkansas community candidates, and several special administrators, and to protect, the state of Kendall. I'm going to take five minutes if I may, and address the workers compensation issue and the exclusive remedy. Mr. Merz is going to address the duty issue, and we'll leave the comment issue with Ms. Holt, because we had resolved our matters with the comment. Before you, justices, this is a motion for summary judgment. You know the standard review much better than I do. It's a de novo standard review. The only thing I would comment about that, which is going to be integral to my argument later, is that according to Martin v. Keeley, and I believe in one or both of the Combs decisions from this court, notably, when the existence of a duty is dependent upon disputed facts, the court says, at least Martin v. Keeley, that's left to the trier effect. And I think that's salient and important for a later point in my argument. That's the standard review that I was going to refer to. So the facts, the court knows the facts. What we represent, our firm represents one, and Mr. Merz's firm represents two 14-year-old girls who were electrocuted and killed due to an irrigation system in a field when they were performing de-tasseling work. I'm going to leave a lot of the facts, the salient facts about the duty issue to Mr. Merz. For my purposes on the workers compensation facts, I want to be very careful with my words, so I'm candid and transparent with the court. Can I ask you a candid personal question? Yes. You are not disputing that Monsanto had a contractual obligation to pay comp benefits in this case and did in fact pay them. That's correct. So is your point a little more subtle as to reading the briefs? You're thinking that that's not sufficient to trigger immunity unless the party seeking the immunity also qualifies as an employer under the Act. You hit the nail on the head, Justice. Is that your point? Yes. So there's really two issues. All roads lead to Section 5 of the Compact, that the plain language of the statute nobody can get around. The Supreme Court can't get around that. We can't get around that. And in fact, it's cited repeatedly. And look, we're only talking about three main cases here, and then a fourth will be left when we're talking about Kay and Merz, this Court's opinions in those two, and we're talking about Iover. But look, before we begin that process, what do we have to consider? His entire argument, Mr. Gutierrez's entire argument, derives from the exclusive remedy set forth in Section 5A. That we know. I mean, there's some things we agree on, some things we don't. That's what his argument is. He's here on a wish list of summary judgment on that point. So his own opinion looks at Section 5A. That's what in Merz's case, this Court cited it verbatim. No common law statutory right to recover damages from the employer, his insurer, his broker, and it continues. There's no question, and I don't think Mr. Gutierrez is arguing, that the entity here, Monsanto, was the insurer, broker, or service organization. So we're taking those off the table. So as a matter of law, in order for him to prevail, Monsanto has to be the employer. Let me answer this question. Mr. Gutierrez, why do we get an order that says that the decision to pay the workers' cap is dispositive? What do you make of that language? Well, this is the only Supreme Court, so why is it wrong? No. So it's wrong. I would say to you that there's a two-pronged approach to this. First, you have to fall within the bucket of the categories. I mean, let me approach it a different way, Justice. Does the statute say, regardless of the relationship between the parties, regardless of the relationship, if someone pays cap insurance, it's so facto, there's no cause of action? It doesn't say that. It doesn't say that, but does it also, does the act say that if you obligate yourself contractually to pay the cap benefits, you become, by statutory definition, an employer? Can they make that argument? They've made the argument. It's wrong. Let's look at the case law. Let's look at IOWA. Justice, there's no question that in each of these decisions, the two from this court and IOWA and the Illinois Supreme Court, what do the courts address first? The courts address first the relationship between the parties. I don't think that anybody can argue about that. They address that first. In IOWA, they found, as a matter of law, they did in the Supreme Court, that a joint venture existed. And it wasn't. I mean, that wasn't a leave of faith. They had a written document that says we're bound at the kiss, right? That's IOWA. Look over at Kaye. This court analyzed all the facts. And, you know, we can all read the opinions. I mean, the budgets were the same, the holding on the entity, all this stuff. And they look at it. And this court, the second district, found in Kaye, as a matter of law, there was a joint venture. And that's their agents, okay? Now we're following their bucket under Section 5A. What did this court say in Burge? No, you guys are making the argument. You being the defendants, you're making the argument. I'm sorry. The defendants in that case were saying all were a joint venture in Burge, all were agents. This court first analyzed the relationship. And it said, and analyzed all the facts I don't need to get into, and this court concluded there wasn't a joint venture and there wasn't an agency relationship. The point that I'm saying is implicit in all this is obviously the plain language of the statute. It screams out. Mr. Hattari and Monsanto would like you to find that the statute reads, regardless of any relationship, and the funny thing about this, I mean, funny, not funny, ha-ha, but the ironic thing about this is this case screams out for this issue. Monsanto, a multibillion-dollar entity, right? They drafted, their lawyers drafted this in a very specific way. They said expressly, these people, undisputedly, Monsanto, before lawyers in Washington, these girls were killed by cornfields, they said they're not our employees, they're not our agents, we're not in a joint venture, you are independent contractors. Just pause and think about that. Now, remember when I said initially, I know I'm on a very limited time basis, remember when I said the issue about the standard review and the duty issue, right? If you accept what I've asserted, which is you have to go to the statute first and first find the relationship, and then, sure, one of the criteria that concords, so I'm not going to, you know, I'm not going to be dishonest. They do look at whether or not they had a legal obligation to pay. I understand that, and they did pay that, and I'm not disputing that. That's not the lip assist, and that's not what the statute is. But in fact, in Burge, that was the final conclusion. It wasn't that they were related employment-wise. It was that the immunity under Section 5A cannot be predicated on a defendant's payment or worker's compensation unless the defendant was under some legal obligation to pay. So notwithstanding the relationship, that was the final conclusion. Well, I would suggest if you look at paragraph 789 in this Court's opinion in Burge, that's why you went through, not you, the second district, went through that context in terms of whether or not there was a professional relationship. I mean, look, everyone, I mean, K, this Court's decision in K, which Monsanto is not looking to as heavily, this Court said, the evidence clearly shows that Sintegra and NIMC were joint employers of K and that Sintegra provided the worker's compensation insurance that applied to K's entry. As such, Sintegra was immune to civil action. This Court itself used the word and. It found a professional relationship or the relationship first, then went to the compensation about who pays the insurance, and as such, I'm just quoting you. I mean, this is the second district. So you're saying in essence that for Monsanto to be immunized in this case, we would have to find that they were employers, correct? That's correct. And so then we get to the issue. And before Mr. Guitart spends a very good word, he's going to come up here and he's going to say all these elements that evidence in the record of joint employer. Look, I can wax on all day about this overwhelming evidence we have. I mean, that our energy or the energy there, R&J, they hired them, they interviewed them, they filed for them. It's a question of faith. Absolutely. And you know what? I mean, I think a Winnebago County jury, when I put that, when Mr. Ambrose and I put that contract up, and they said we, R&J, these people are not employees for any purpose. That's the word. That's their language. Not Devin Ambrose's language. That's what Monsanto said. Just think about what we're talking about here today. Well, let's put it in proper context going forward. So if we were to accede to the correctness of your position, are you saying that Matt would have to be remanded for an issue? Hearing on that issue? We can't find him, can we, that they are not employees? No. No, you're absolutely right, Justice. I mean, looking at this intellectually, honestly, right, if we go with Section 501st, and even I over all this. I mean, I'm saying if we agree that there's two elements, there's the payment and there's the employee-employee-employee relationship, under the fact that we would accede to your arguments, then we have to be remanded, right? Remanded and let the jury decide whether they were joint employers. That's the question. And we can, I mean, I'm happy to discuss and talk about the five factors that this court said, you know, how you get a choice. I'm looking into this more. No, I know. But I just want to leave you. We have very strong facts that would suggest that, you know, they are not the joint employer, and that's for the jury to decide. And if they're not a joint employer, they've already said they're not the employer, right? So, I mean, they're not the employer. Earlier on in the case, at the trial court level, defense counsel from Monsanto said that R&J was the employer. That's the point that I'm making. They've always contended that they're the joint employer. But that, I suggest, is a question. I mean, how else do you get there? Can one become an employer by electing to become subject to the provisions of the Act and so forth, and what are the definitions of the Act? 182, definition of employer, electing an entity that elects to become subject to the provisions of the Act? Well, I guess we don't get there in this case. I'm not trying to be evasive, Justice. We don't get there when they're writing a contract that says they're not our employees. I mean, just, I want to finish with this. I know my time is limited. We're standing here and they're saying that these, the states of these two girls are barred as a matter of law because of the Comp Act. The only way to get to the Comp Act is to say that we're the joint, that they're employees of ours. Right? I mean, everybody has to, I mean, I want to focus on that. That's true. You've got to get through 5A before you build up part of these people's cause of action. And they're saying in a written document they are not our employees for any purpose. I mean, I couldn't have written it better. And you'll have the, I get the time. I'm sorry.  Mr. Mervis. My name is James Mervis and I represent the estate of both Hannah Kendall and Jay Garza. My colleague, Mr. Bruce, has now addressed the issue of the Workers' Compensation Act. My argument will be focused on the issue of whether Monsanto owes a duty to 14-year-olds Hannah and Jay. The evidence in this case overwhelmingly demonstrates that Monsanto is possessed of a duty of care to the decedents. For over a decade before this tragedy, Monsanto has established and undertaken a duty to consistently call and notify the growers before sending children into the field. Monsanto also undertook a duty to inspect the field and make sure that it was safe before the children entered it. Monsanto reached the duty and two children were killed as a result. Now, Monsanto... This is, this is something that was, what, practice and custom or, you know, why did they do it? Well, with respect to calling the grower, Monsanto called the grower for 12 years preceding the date of this incident. Why? Monsanto's purpose was to notify the grower that Monsanto was sending children into the field through its contractor. It was sending children into the field so that the grower could ensure that the field was safe and could discuss any issues. In fact, Kevin Markey, in his deposition, testified to the specific reason. Kevin Markey said that if he had been called on this occasion, he could have and would have said to Monsanto, it's not safe to send children into the field. I've got deer deer out in the field and I've got electrical problems using those words. And he would have been able to tell Monsanto that it was not safe to send children into the field. So Monsanto didn't call the grower for the purpose of discussing the weather or discussing the cult game. Monsanto called the grower immediately before sending children into the field to notify the grower so that the grower could raise issues if, in fact, there were issues. And in this case, there were issues. He had a sub-heavy irrigation system out in the middle of the field that was known to be in the path of the children. And he knew that he had electrical problems and that Monsanto had complied with what was established as a custom usage and practice. The grower would have been able to notify Monsanto that Monsanto should not send children into the field. Well, what about when Monsanto gets there, and they did, someone was at the field when the children arrived, correct? Well, actually, there's no evidence that someone was in the field when the children arrived. The evidence is that the sub-heavy irrigation system was in the field when the children arrived. Correct. That was the point I was getting to. Somebody, if this has happened for 12 years, the irrigation system is supposed to be out of the way. It's supposed to be on the far end where it can't be contacted. It's in the middle of the field. Doesn't somebody see this and stop the process? Well, in fact, who would that person be who ultimately stopped that process? Anybody who was there with the children. Or Monsanto. Monsanto could stop the process. Now, your point is a very good one. I want to expand on that point and then erase it. Monsanto had been in the field the day before. The undisputed testimony in this case is that Monsanto had a practice of infecting the field to ensure that it was safe. Monsanto had field representatives in the field who were testing soil samples to make sure the soil conditions were appropriate. Monsanto had representatives in the field, in fact, in this case the day before the incident, who could have and would have seen that the irrigation was out in the middle of the field. So Monsanto had a practice of infecting the field as well.  Part number one, Monsanto established this custom, usage, and practice of following the girl and forcing the children in the field. Part number two, Monsanto also had a duty to infect the field and, in fact, did infect the field the day before. All Monsanto's representatives had to do was open their eyes and see that you're here in the middle of this field. Monsanto is undisputed. Monsanto was aware that coming into contact with an irrigator put children in harm's way. That's why Monsanto had educational materials that are disseminated through the contractor telling children, do not come into contact with the irrigator. But what do you make of that? Monsanto was saying that their policy was there was training specifically that told everyone to avoid the irrigator if you don't want to hear them. Does that provide any insulation for them? In terms of? In terms of telling everybody, avoid the irrigator. Period. Well, Monsanto provided educational materials to the contractors. R&J Enterprise. The R&J Enterprise was then discussed with the children among other materials. Telling the children to stay away from the irrigators. The real question is why. Why did Monsanto provide educational materials telling children to stay away from the irrigators? And the reason that Monsanto did so is because Monsanto knew that if children came into contact with the irrigators, they were in harm's way. And thank you for your question, Justice Hudson, because it brings me to this point. First, this report doesn't backdrop. While the foreseeability of injuries to the particular plaintiff is properly considered in the duty analysis, the foreseeability of the particular injury or damages are more properly considered in determining the statute issues of proximate correlation. If I can come in just briefly. Sure. What? Therefore, Monsanto, throughout all of his injuries, complains, complains the analysis of duty with the analysis of breach of duty. This court must focus on the issue of whether Monsanto has duty and not focus on the issue of whether breach. Of course, there's a factual issue of whether there's a breach or not. We believe the evidence is overwhelming that Monsanto breached his duty. But the issue here is whether there was a duty. That is a legal determination. There's overwhelming arguments in support of the existence of that duty. You make the point that you're relying on cases that have to do with the special relationship between the plaintiff and the defendant. And there is no special relationship here. So then you go move on to the factors. Justice Breyer, thank you for the question. One of the cases that Monsanto relied upon in the argument that there's no special relationship was that rather bizarre case involving Marshall v. Burger King. In the Burger King case, it was a case where one of the accelerators had gotten stuck while the plaintiff's decedent was dining at a Burger King fast food restaurant. The car of the defendant went up in the air, went through a brick wall and window, crashed down onto the plaintiff's decedent, killing them. The issue in that case was whether or not the Burger King restaurant had a duty of care to defend against that freak or bizarre accident. Ultimately, the court in that case found that Burger King did have a duty. Reversing the trial court, the court found that Burger King did have a duty of care to its invitee because it was a possessor of land and the plaintiff's decedent was an invitee. Well, Monsanto was a possessor of his farm land. And the invitees in this case would be 14-year-olds Hannah and Jade. So I don't concede, for an instance, that that special relationship as discussed in the fourth element of the new statement of the court, I don't concede that special relationship did not exist. In fact, it did exist. And that's, of course, the essence of the case. All right. Thank you very much. Thank you. Ms. Pollard? May it please the court and counsel, in addressing the issue of defendant Commonwealth Edison's motion for summary judgment, which must be denied because an issue of material fact exists as to the issue of duty on the part of Commonwealth Edison. The issues of material fact are raised by Dr. Patton's affidavit, which plaintiffs have hatched their resistance to the motion for summary judgment. That affidavit is prudently sufficient under Rule 191A for the reasons that come in our brief, and which I could address again. Would you agree that the trial court's ruling was correct if that affidavit was properly stricken? If the affidavit is properly stricken, then the plaintiff has no fact in evidence to support the existence of a duty. So, yes, I agree we rely on that affidavit. The court took the original motion under advisement. Is that correct? That is correct. And then the court ruled without actually giving them the opportunity to amend? The court in our case bar denied any leave to amend. He originally stated on the record that he would take the motion for leave under advisement. He stated that if it were necessary for plaintiffs to amend, that he believed plaintiffs could easily do so and cure the procedural defect. But the plaintiff was not given the opportunity then? Correct. Does the court also say that Patton's affidavit, if proper, would establish a genuine issue of material effect? Negative. The court ruled that even if the affidavit had been procedurally proper, that the conclusions of the expert were overly conclusory and could not support a resistance of the motion. What I'm saying is he indicated that Patton's affidavit was proper and would establish. In other words, if your expert's affidavit was sufficient, it would establish a genuine issue of material effect. He obviously found it insufficient. Insufficient on multiple grounds. One, procedurally, and two, that it had to be a genuine issue. But what I'm saying is it's a little perplexing if you acknowledge that it would have been if it was proper, but then you didn't get the opportunity to do that. I completely agree. Is that the gist of your argument? It's not the gist of my argument because his ruling also found that the affidavit was improper in that it was conclusory. And I would disagree with that as well, that the affidavit is supported by opinions with valid bases. Are there some case files that are analogous to this that support your position? My position on... And the affidavit being sufficient. The defendant's side endeavor is the case Woolens v. Hunt, and in that case it's discussed also the sufficiency of the affidavit. In the case cited by the defendant, Woolens v. Hunt, that affidavit is found to be insufficient, but the court compares it to another affidavit that was found to be sufficient. And I don't have at my fingertips the citation that the Woolens court makes in that case, but they compare it to an affidavit that was factually sufficient and for similar reasons that ours is. And our affidavit, therefore, can be distinguished from the one in Woolens. All right. So the argument is truthful. The court erred because you believe it wasn't sufficient. And secondly, you're saying, in any event, you should have given the opportunity to amend it. And further, that the affidavit, yes, that it's sufficient under Rule 191A and it's sufficient in that its conclusions are not conclusory, but rather... When was the actual first motion made to amend? It was made at the hearing for motion for summary judgment. All right. And how long into the proceedings did this motion for summary judgment come up? The defendant, Thomas Edison, had made a motion for summary judgment, which they supported with a brief. We replied in opposition with the affidavit, and they moved to strike in conjunction with their reply in support of their motion for summary judgment. All right. Although this case is very, it's been a lengthy procedure, this particular motion for summary judgment has not been stretched out over a period of time other than to brief, to argue, and then to judge to make a decision. Correct. Right. So in terms of, say, another case that I believe is cited by the defendants, that Robodeaux case, Olaf Robodeaux v. Oliphant, there was a specific finding of untimely next. Correct. How does your situation relate to that untimely next? The defendants brought their motion for summary judgment at the close of fact discovery, but expert discovery had not yet taken place. We could have moved to delay the consideration of the motion for summary judgment until our expert had been disclosed and deposed. Alternatively, we took the position that his affidavit would be sufficient to resist the motion for summary judgment, and so there had been no deadline set for a disclosure. And that's another contrast to the Williams case, where the affidavit was brought forth resisting the motion for summary judgment after the plaintiffs had already failed to timely disclose their 213F3 experts and had never asked for an extension of time to do so. The trial court did note on the motion to reconsider, it's ruling on the motion to reconsider, that you didn't seek leave to amend this affidavit in response to the motion to strike. I did draw that to his attention. Well, the trial court relied on that as far as the timeliness aspect, correct? The trial court was aware that I had requested leave to amend. He said that he took that under advisement. In ruling on the motion for summary judgment, that ruling was silent as to the issue. And I asked him, how then does our motion for leave to amend fare? And he said that because we had not brought a written motion for leave to amend, he would not consider the motion. And this is in contrast to his earlier statement that he was taking the motion under advisement. So he decided that the filing of a written motion after the fact was untimely. I thought the import of his comment was that you did not seek to amend it in response to the motion to strike before you went to hear it. That's fair. However, the motion to strike, I cite Williams v. Huff for the fact that the motion to strike is not procedurally necessary. The court in Williams v. Huff noted that the defendant didn't need to file a motion just to strike but could have made the same argument about the proficiency of the affidavit, and the court could have ruled on that affidavit proficiency as part of the motion for summary judgment. So although they made a formal motion to strike, I can only take the position that our motion for leave to amend was timely. It was at the first court proceeding following the filing of the defendant's reply brief. Good morning, guys. My name is Joe Cotari. I represent the Kennedy Monsanto Company. It's a pleasure to be here before you today. I'm going to talk about duty first and then maybe corpus cop issues if I may, unless you'd like me to go over. But as to duty, let me start off with duty is, of course, a question of law. Proximate cause is only a question of fact. That is why my opposing counsel has been consistently trying to characterize our argument as conflating these issues in an effort to make out an issue of fact, where really it's just a matter of law before you, and that's duty. So as to duty, you shouldn't be fooled. This isn't about the general duty to use reasonable care. Of course, everyone owes everyone else a general duty to use reasonable care. This case isn't about tripping on the irrigator or running into the irrigator or falling off the irrigator. It's about electrical shock, right? If I reach out and I get zapped by this microphone, did the state owe me a duty to prevent that injury? Well, under their theory, it owes me a general duty of reasonable care, so I guess they've reached their duty. It's not that simple. It's about electric shock. They didn't have a duty to prevent me from being shocked when I touched this microphone. Wait. You have, or on that day, there is an irrigator in the middle of the field or in the field. Maybe it's not directly in the middle, but it is certainly not on any of the ends where it is not only customary. It really is appropriate. So why is this not an issue? That's a misunderstanding which is reasonable given the way the briefs have played out. The irrigator is rooted in the center of the field, pivoted, and it goes around in a circle. It's always in the middle of the field. It's never off one side of the field. So no matter what, it's always in the middle of the field. And the fact that it's in the middle of the field is not an obstacle to detesting. Detesting can go on around the irrigator, whether it's in an up and down position or off to one side at 2 o'clock or 2.30, doesn't matter. It's a position on the clock that the irrigator is in. The only reason that Monsanto had a habit of calling the grower and letting him know that cutting was done so that the detesters would be coming next was because the machine cutting process requires machines to go along through the field in a position where the rows are lined up with the machines. And if the irrigator is out at an angle, it's in the way of the machines. It doesn't get in the way of the detesters. The detesters are on foot. They can work around the machines. It's no big deal. That's why this is all a big red herring about custom practice and calling. The reason they... If they're underneath, how could they ever come in contact with it? Well, the irrigator is up high. It's a big long pipe, and it's got an A-frame wheel on it. Every, I don't know, 50 or 80 yards or so, there's a set of wheels. And then there's another set of wheels. It rolls on those wheels around the field in a big circle. The pivot is where the electrical components are. There's a pump, a hydraulic pump and a water pump. That's what follows this thing around like the hand on a clock. The only time the mechanism touches the field is at the pivot and at those sporadic wheels every 50 or 80 yards or so. Once again, how could they... How could... I grew up on a farm. How could they touch that? Where the wheels touch the ground, there's a metal A-frame. And if an irrigator is walking around, a protestant is walking through the field, they come upon those A-frames. They can touch that and climb on that. That's why the Sanctuary of R.J. taught them to stay away from the irrigator when you encounter them in the field because it's dangerous. You're going to encounter them. Well, they're detached from that thing, and that is there. So they could come in contact with it. Every day that field has ever been detached from since 1976, when that was installed, that thing was in the field. It's never been a problem. Never been a problem. So that makes it apparent that there is no duty because there's never been a problem before and there never will be in the future, we hope? No. There is no duty to prevent freak accidents from happening, and this is a freak accident. It has never happened before. It has never happened since. We talk about notice. What notice did Monsanto give that there was a problem, that there was an electrical problem with the irrigator? It never had any notice. In contrary to Mr. Mertz's suggestion that they were there the day before, that's not on the record. I encourage you to ask them about who from Monsanto testified that they saw an irrigator out of the lane, stuck, spalled in the field the day before the accident because it's not on the record. You're saying, as a matter of fact, there's no evidence that they were there the day before. There is no evidence that they were there the day before. Is there any evidence that they were there the morning that the detachment started? No, they weren't. They weren't there that morning. R&J was there at the detachment. Monsanto had no knowledge that there was any problem with this irrigator, ever, before this accident happened. That's a fact. That's on the record. This statement that's coming out of the oral argument is not supported by the record at all. Mr. Larkin, I understand you're calling testified that Monsanto representatives would be in the field on Monday, July 25th, didn't think there was a problem. What was that testimony? There's testimony that Monsanto has folks in the fields throughout the growing seasons, generally. They're always checking on the crops. So a truck will pull up, somebody will walk, they'll take a piece of corn off, they'll check it, they'll check the ground for moisture levels. That's happened throughout the growing season. But nobody said, I'm over at Monsanto, I was there the day before the accident, I saw the irrigator out of the plane. That's not on the record. That's a fact. But that's not really an answer to Justice Hudson's question. Larkin does say something that they would be there throughout the detasting process. Right, and that goes to why it's ridiculous to suggest that Larkin didn't know the detasters or somebody was going to be in the field, because he knows as soon as the field's been machine cut, the next step is the detasters will be in. Within a couple of days, he knew that. He testified to that. And if they're going to detasto, Monsanto is going to be there. No, no. Then why did he say that they would have been there? Monsanto does not handle the detasters day to day. They're not in the field. They're looking to see what's happening. They're not handling the detasters. They're checking. My understanding of what Larkin was saying is they weren't there to manage the detasters. They were there to check that everything was appropriate for detasting. They were there in the field that day. Nobody testified that anyone from Monsanto was in the field in the days immediately before this accident. What they testified was, generally speaking, someone from Monsanto is in the field all throughout the growing season, as a blanket statement. If crops are being grown, typically someone from Monsanto is going to be popping and checking on the crops throughout this season. There's nobody who could, a Monsanto employee, in that field that weekend. Nobody who could, a Monsanto employee, in that field the morning of this accident. I think we understand the argument on that issue. Getting back to one of the central, contested issues in the case, is whether or not Monsanto's payments, contractual obligations to pay workers' comp benefits and didn't pay workers' comp benefits, does that immunize them from any civil liability under the exclusive only provisions of the compact? Absolutely. Obviously, it's going to be your position. Counsel says, well, they may have officially obligated themselves, they may in fact have paid it, but there's a missing element running through the other cases. That is, they must also qualify as an employer. So there's two elements that must concur according to Mr. Bruce. So what say it's you in response to that? It's supported by the case law. And I think you spoke, you represented that Kay was in some kind of a joint venture case. It's not a joint venture case. It's a joint employer case. We've articulated why Monsanto was also a joint employer with R&J. That's a second argument why the compact applies. If they were joint employers, they get the immunity. If they paid for the comp, they get the immunity. So you're saying it's an either-or, it doesn't have to be both? Yes, that's exactly right. What case law stands for that proposition? Well, Burge didn't feature joint employers, for example. You have a specific case that says if you pay comp, that's dispositive, that's this, it doesn't matter what your relationship is to the party. You have a case that specifically says that clearly. Yes, either-or, Kay and Burge all said that clearly. What Burge says in this paragraph 15 is that there has to be some legal obligation to pay, parentheses, such as the contractual obligation imposed by the joint venture agreement in IOR. It doesn't say this was a joint venture agreement, does it? No, but I don't think it does. Well, how can you not be responsible in some employment as employer or some element and have this obligation to make these payments? Because you're contractually responsible. They signed a contract with R&J that said we, Monsanto, are contractually responsible for these payments. But we're not the employer. Well, they can characterize themselves as not the employer or as an employer. That doesn't make a difference. The law focuses on control. No court would ever say, oh, well, they didn't say they're the employer, so we don't have to analyze whether they control these employees or not. It's all about control. What they characterize themselves as doesn't matter. Well, let me ask you a question. Whether they're an employer or not, if they have some control, then that's the factor or not. Let's say they're not an employer, you know, but they exercise self-management control. That plus the payment of the workers' cap is enough? Well, again, if you're taking the cap, they get the benefit. No matter what. No matter what. If they exercise the control laid out under our joint employer section of the briefs, and there's a whole list of factors that you look at to see how much control they exercise over these different issues, payments, scheduling. But the idea of this payment standing alone, absent any other relationship, is simply a way to close yourself of immunity when you otherwise would not be subject to that measure. Well, I respectfully disagree. I think that the law is black and white on this. If you pay for the cap benefits, you get the immunity under the Act. You're saying irrespective of your relationship to the partners. Is that what you're saying? Yes. It has to be because Mr. Bruce laid down the gauntlet. He said that you've acknowledged in writing you were not the employer. Is that correct? That's correct. Absolutely correct. So you're all in on the cap payment. Absolutely. Now, that's the, if you pay, you get the benefit. You know, you get the, there's the analogy that I heard about if you pay for the cake, you either get to eat it or keep it under the old law. Well, they say no. If you pay for the cake, you get to eat it. Yeah, but if you're also, I mean, you've got to read it in the context of the case. If you're also a joint venture and you pay for the cake, you get it. Right. Right. Let me ask you a hypothetical, though, to maybe draw this out a little bit. If I manufactured at my plant the most dangerous machine in the history of humankind, okay, and it's used to manufacture something, and I sell it to you, and I say, you know what, this is a really dangerous machine, so you're going to designate three employees that are going to run it. I'm going to pay the account. I have no relationship to you other than selling the machine. I have no relationship to your employees. I don't have any control over them, nothing. But I'm clearly trying to claw myself immunity because I could really lose my entire company if somebody gets seriously injured or killed from this machine. You're telling me, under the law, I'm immune. I believe so. Under the laws that exist today. Even if it doesn't fly in the face of a plume and public policy. Well, public policy considerations are weighed in all those cases, but the law came out the way it came out. I order it as black and white law. It's very simple. If you pay, you get the benefit. Now, that's one argument for the exclusive remedy, and then you've got the other one, whereas if you exercise all these commands of control that we've identified in the briefs, then you get immunity as a joint employer. What's the question of fact, then, Mr. Atari? Is that a question of fact? No, I don't believe it is. I believe that you can describe it as a matter of law on appeal that we also follow. So control would be a matter of law without conforming to the underlying facts? I'm sorry? How do you determine control and not being a fact or a question? Is control a matter of law? Well, the amicabes that they support, they're unrebutted and they're uncontested. All of the manners of control that have been put in the record have been completely unrebutted. Those are uncontested. That ensures the fact that I think the court could rely upon in deciding that even if you don't get the immunity because you're paid, you still get it because you exercise control. All right. So what you seem to be saying is the issue of whether or not the benefits you're paid should be controlling and dispositive. If not, if we were to reach, as I asked Mr. Booth, the second issue, you're saying the element is there. I am, yes. Just like other duties, you know, you talk about why there wasn't a duty to prevent or free the unforeseeable accident, but even if there was a duty to call or a duty to train or a duty to inspect the field, we met all of those duties. So that's another reason why the Rockefeller cases were rightly tossed, because we met those duties. That's a breach issue, isn't it? Well, I mean, you're assuming there's a duty that we move on to breach. I mean, I don't know if the trial court didn't get that far. No, it didn't. It didn't address the cost of the cost either, but for the reasons stated in our briefs, we think that's another reason why the Rockefeller court put up on the trial court, is to say even if there was a duty, it doesn't matter because these accidents were so unforeseeable that there's a break. It's not an unusual cause. But if the court never got there because it found that there was no duty, we can't just assume. We can't do that at this level. Well, it's de novo standard of review. So the court can affirm the trial court's decision for any reason in the record. So respectfully, I think that the court could find a lack of proximate cause. It could find that if there was a duty, we met those duties, or it could find that there wasn't a duty to prevent an unforeseeable freak accident like this, which a Welsh case law suggests. Yeah, but how do you, I mean, I am not a fan of Burger King. I love Marshall v. Burger King. But how do you then put your case in line with Marshall v. Burger King? Because who knew that somebody's accelerator would stick and this vehicle would go through the window? Nobody, but there was a duty. No. Respectfully, Your Honor, that's not the case at all. The Burger King case said there was prior knowledge of similar accidents in all kinds of restaurants. Please, ask them on rebuttal. Name one instance where an eargazer became electrified over two football fields away from the only electrical source in the field. Electricity doesn't run away from the eargazer. It stayed with the eargazer. Identify one case where this has ever happened before. Do you all hear anything? Because it's never happened. Oh, it may have happened. It just mixed up. Well, you wouldn't be able to find a plea, presumably. Yeah, well, that's not what you said. Find another case. It may have happened. I don't think we'd be able to find out to you if it did.  Are there any questions that you'd like me to address? No, other than you're all in on the account payments. I mean, your fallback is there's a control issue, there's an employer issue. But you're clear it's not necessarily, under your interpretation, the case alone. Is that a fair summary? Yes. I think if you pay for the account benefits, you get the benefits of the interview. And until the law is changed, I understand that Mr. Bruce thinks that they got it wrong. Respectfully, they're the Supreme Court. So I don't think this is the forum to tell the Supreme Court that they got it wrong. But maybe it is. Maybe I'll be proven wrong. Thank you very much. No worries. Thank you, Mr. Carter. Thank you. All right, Ms. Weiler, do you have a comment? Good morning, Your Honor. Good morning. May it please the Court, Counselor Weiler, on behalf of ComEd, ComEd is asking that this Court affirm the ruling of the Circuit Court granting summary judgment, excuse me, affirmative ruling of the Circuit Court granting summary judgment in favor of ComEd. First, I'd like to address some of the issues raised particularly by Justice Burke related to the affidavit that was submitted in opposition to ComEd's motion for summary judgment. The Court discussed a lot about the timeliness of whether or not the plaintiff should have been allowed to file an amended affidavit. The problem in this case, and it becomes a substantial problem in evaluating the propriety of the summary judgment order, is no affidavit, no supplemental or amended affidavit was ever submitted. So we are not in a position to evaluate whether the plaintiff could ever have tendered an affidavit that would be sufficient to establish that there should have existed a duty in this case. Why would you do that if the trial court, you know, I read the transcript where the trial court said, I'm going to take this under advisement. I'm not sure you need it. It basically kind of led them down the path of, you know, I'm not sure we're even at that point yet, so I'm going to take your – why would they, after the trial court said, take it under advisement and submit something? And I was not in the trial court that day, so I don't mean to mischaracterize what was said, but my understanding from the record was it was more of a suggestion. I'm not sure you need it because I'm not sure that it would change the outcome of the case. And that itself comes back to a point that was raised earlier in the argument by plaintiff's counsel. This is fundamental. Plaintiffs, for all parties, continue to argue that if there are disputed facts in a case, then a duty issue cannot be resolved. This court essentially, the plaintiffs are saying, cannot make determinations about whether a duty, for there are disputed issues of fact in plaintiffhood, consistently relied on the Martins v. Keeley case from the Fifth District. That was overturned by the Illinois Supreme Court. That case is no longer the law, and instead we have a case as straightforward as Simpkins, where the Illinois Supreme Court did specifically direct and instruct courts of this state that questions related to duty, even where there are disputed issues of fact, are to be resolved as a question of law. Can we get back to the affidavit? I'm not sure you answered this question. As I read the record, the Knapp's counsel specifically asked Hurley to remedy, quote-unquote, the defects noted by defense counsel. So that was a pretty specific request. And the court never ruled on that, correct? I believe that's correct, Your Honor. And in that decision, where you suddenly announced summary judgment without giving the parties the leave and opportunity to amend, can that be argued as arbitrary? No, Your Honor, because in this situation, an amended affidavit, there's nothing in an amended affidavit when one looks at the patent affidavit as it was submitted. Well, there wasn't an amended affidavit because they were never given leave, so there couldn't be an amended affidavit. But even recognizing the possibility of an amended affidavit, if one looked at what Mr. Patton stated in the affidavit that is before the court, the concerns of the trial court and the arguments raised in the trial court were that the affidavit did not specifically comply with the requirements of Rule 191 for a few reasons. Excuse me. One is because the documents on which the statements made in the affidavit were not attached. Well, even if those supporting documents had been attached, it would not have been sufficient to establish the existence of some sort of a legal duty owed by comment. How do we know that? Because we can look at what the specific claims were. These are in paragraphs 6, 7, 8, and 9 of the patent affidavit, page C, 2012 and 2013 of the record. I understand that the court is asking, well, shouldn't the plaintiff have been given an opportunity to add to those subsequent claims? That's when the court says that it could have been sufficient. But there is nothing in the record that shows how or what or whether. There wouldn't have been any additional information sufficient. How do we know that? You're limiting yourself. You're setting up to straw man that there's nothing in the record showing amendments because there wasn't the opportunity given to amend, correct? The plaintiff could have sought leave to file an amended affidavit. And that's what she did. But with the affidavit, it would be analogous to asking a trial court for leave to file an amended complaint and submitting the proposed amended complaint. That can support the opportunity to evaluate that pleading and determine whether or not it was sufficient. But we're thinking around the issue. If leave, you conceded that she asked for leave to amend the affidavit to correct the defects. That's correct. Was that opportunity given? You're saying, well, it doesn't matter because it wasn't intended. We're going around the circle here. The question was, did she ask for leave? Answered yes. Was she given leave? Answered no. It went into some sort of judgment with no ruling on the request. Is that correct? That is correct. It was taken under advisement. And I'm not trying to avoid answering the court's question. The reason it's difficult to give an answer to the question of was the plaintiff given that opportunity, the plaintiff could have submitted something. The plaintiff could have said. Well, we already talked about that. I don't know if you're talking about after the request was made or before. I mean, the trial court noted in its October ruling that the plaintiff could have submitted an amended affidavit in response to the motion of strike. It didn't do that, and that's a survey given. And that is exactly my point over here. Because, I mean, if we get past that, if we agree with that, then we'll agree with the trial court, and that's basically untimely, and that's that. If we say, though, that if we get past that, when the trial court says, I'm going to quote, I'm going to take under advisement your request to amend the affidavit. I want to take a look at the whole big picture first and determine whether I think that's necessary. I do believe you could easily amend the affidavit to say it's under personal knowledge and attach those documents. I'm not certain that that's necessary. I'm going to take a look at it. So, I mean, at that point in time, any reasonable plaintiff would say, well, I may not have to do anything, and I may win this motion anyway. And if I could give essentially a two-part answer to that question. The first is, Your Honor is exactly correct. That's my point. The court made clear the plaintiff had the opportunity in response to the motion of strike to submit something, and that's what I'm trying to convey. If that opportunity existed, it would not deny the plaintiff, and I think the trial court recognized that. The other piece that's important is the answer I tried to give, and I'm sure it wasn't clear enough earlier, related to that statement by the court, the statement by the trial court, I'm not sure that you would even need it. Well, the court, again, having not been at the hearing, so I don't mean to mislead the court about what the trial court was saying, but my understanding from reading that record myself is it may not make a difference. It may not make a difference to the court's analysis where what you are asking the court to do is allow the plaintiff to file an amended affidavit attaching any necessary documents and attesting that the statements made in the affidavit are made based on the plaintiff's personal knowledge. If you add those two pieces alone, that may not change anything related to the court's analysis about substantively. Well, that was, in fact, the position argued by whoever was there on behalf of Commonwealth Medicine that day, but that's not what the court said. And, again, that's my understanding. And the court, I mean, if I were counsel and I heard the court say that, I'd go, well, I'm going to get prepared, but I'm not going to file anything yet because it may not be necessary. Are there other two technical arguments that it did not comply with 191? But, fundamentally, the argument to comment is exactly what you're saying, Justice Holder, because, Justice Hutchinson, because what you find yourself in a position of doing is saying what the trial court did. If you are allowed to correct the procedural errors that exist based on the language of Rule 191, and this is the language that is talked about in Roe v. Doe, if you're allowed to correct this procedural failing, does it make a difference substantively? The answer to that has to be no. It doesn't make a difference substantively. The court asked earlier about the basis of the trial court's decision as to comment and whether comment owed a duty, and is it not exclusively based on matters related to this affidavit? This affidavit doesn't raise any issues. Therefore, the court concluded no duty. Certainly, it is true that there were no facts raised in opposition to the motion for summary judgment that would have established in question different analysis for the trial court to engage in about comment's duty. However, well, my knowledge of electrical engineering isn't great, so I'm reading this record. In paragraphs 5 and 6 of that affidavit, there are some pretty technical issues that are raised. That's right. And I don't know how one can say there are no issues of that. Just because it doesn't agree with the court's affidavit doesn't mean that these issues raised in paragraph 5 and 6 aren't, instead, valid issues. There are a couple of reasons for that, Your Honor. First, as a technical matter, as a non-electrical engineer myself, which is why I went to law school instead of becoming an engineer, I agree with the court's conclusion. However, when you look carefully at exactly what the allegations raised are here, they're allegations related to things that ComEd purportedly could have done to its power lines. The problem in this case is that whatever was going on in ComEd's power lines, whether they had fuse protectors or surge protectors or not, that is not ultimately what the problem in this case was. The problem, which is discussed by Mr. Forrest and is unrebutted in this case, is that there was a short in the electrical wiring on the customer's property. It was not properly grounded on the customer's property, and the material that was the problem was the customer's material, not ComEd. So even accounting for some sort of a change to ComEd's power lines, something that no one had suggested would be required by any code, by any statute, by any regulation, even allowing for that, there is nothing in this affidavit that states that making that change would have in any way changed the fundamental problem here, which was, as a result of an improperly grounded piece of equipment on plaintiff's property, this incident moves forward. And then my question then would be, I don't know, and maybe that's why the affidavit needs work, possibly, I don't know the difference between a two-lateral head and a three-lateral head or some terms of that nature, and the connection of the two-lateral to the three-lateral and how it goes through. I don't know that that isn't Commonwealth Edison's property. That is Commonwealth Edison's. That's the power line, that's Commonwealth Edison's power line. And Mr. Patton is saying that's where the problem occurs. Mr. Patton is saying that if he's suggesting that Commonwealth Edison should have had a surge protector or some sort of fuse on that power line. Well, Mr. Patton does not say anywhere in this document if there had been a surge protector or some sort of fuse on that power line, there would never have been a short on the plaintiff's property. That's not here. That could be a conclusion that might not be appropriate. Well, but there is nothing in that. The problem is there is nothing in this affidavit. There is nothing in this record that suggests anything to the contrary. Or do you say that even if that had been done, or if that had been done, that would eliminate the ultimate problem, saying there's nothing that suggests that in this affidavit? That's exactly right, Your Honor, and that's the fundamental problem with this affidavit. That's why, even though I recognize the court's concern about procedure in this case, the substance of the affidavit, when you set aside whether or not the plaintiff could have filed an amended affidavit that included the relevant documents and an adaptation that these statements are made by personal knowledge, there's nothing else in this affidavit that would defeat what Commonwealth Edison had already put in the record that the court just stated, that these changes would have affected the ultimate outcome or somehow would have changed what happened in this case, that somehow Conrad could have done something different. In other words, you're suggesting it should have been done but never tied it into, and in my professional opinion, had it done, it would have prevented the electrocution of any individuals touching the earth here. That's exactly right, and in addition to that, that Conrad had an obligation to do those things because the court was discussing the Marshall v. Burger King case. There is discussion in Marshall v. Burger King about part of the basis of the court's decision being there were building codes that perhaps were violated. Perhaps the building wasn't built exactly as it should have been in accordance with those codes. Now, I must admit, I agree with Justice Hutchinson's disdain for Marshall on a personal level. Nonetheless, that is the law that we are stuck with. But that will not interfere with our judgment in this case. I'm sure that she would agree with this. I'm sure she would. I will follow the law. I'm sure she would. But there is no allegation of a code violation or some sort of deviation from statutory requirement or regulatory requirement here, and that is a crucial distinction as well. I realize it might take a lot of time. No worries. Anything further? Nothing further, Your Honor. We ask that the court adjourn the decision of the trial court. Thank you, Your Honor. Thank you so much. Mr. Bruce, we are back to you. Honorable. Thank you, Justice. A couple of brief remarks. In listening to Mr. Vitaria's argument and the question from the bench, I just have some follow-up points. Number one, if you look at IOWA, the question from the bench was, where is that in these cases? And Mr. Vitaria says it's not there. The very beginning of IOWA, the Supreme Court's decision says, under the express terms of the Workers' Compensation Act, the law's exclusive remedy provision extends not only to the employer but to various other specified entities, including agents of the employer. And then the next sentence, it goes on, as described earlier in this opinion, Halverson was a co-venture with Midwest. My point here is this, and it continues with the Kaye decision, where this court said, and I read it earlier, it was both the finding of the joint employer and the payment of the top act, which resulted, according to this case, in the imposition of exclusive remedy. It's woven into our office. So then I just quickly looked at Monsanto's brief. It's in their brief. They agree with us. The Monsanto brief goes into great length about the public policy. We just heard that, about the public policy. Monsanto's brief, and I agree and embrace, accordingly, the act imposes liability without fault upon the employer and, in return, prohibits common lawsuits by employees against the employer. The exclusive remedy provision in the act is part of a quid pro quo pursuit to which the employer. That's in Monsanto's brief. This is basic. You have to qualify as being one of those categories in Section 5A before you get to this discussion of the insurance payment. But I think they were also saying, going back to the threshold question I asked earlier, they seem to be implying, well, we're an employer because we pay the guy. Does 5A say that you become an employer? 5A definitely does not say that. I mean, that we can agree upon. The plain language does not say that. And in this particular case, and one of you, and I forget which, I'm sorry, asked a great question about Monsanto's position here. Look, let's speak about whether or not they have a case without a relationship. They don't have a case. I have a case, and the answer is Leffoon. It's an Illinois Supreme Court case. It's on all fours. It's an older case, but it's on all fours. Keep in mind what happened in Leffoon, which was the Supreme Court's ruling. Leffoon had a situation where the plaintiff sued Bell & Zopel, which was not his employer, but they had paid the work cop benefits, and the Supreme Court said you can do that. If you're not a direct employee, you don't derive from this. Well, I have a case. They don't have a case. And to be quite candid, this whole issue about employment or not, look, Monsanto has to deal with it. Mr. Contreras has been up here for 30 minutes. I never heard him once address the main point that I'm making to you. They wrote a legal document from their lawyers which said that these people, the R&J contractors employees, are not employers of Monsanto for any purpose. I mean, I don't know how much more clear it can be. For any purpose. That's their language, not mine. I'm not being an employer. He's already conceded that. No, but I understand. But I'm making a finance point, and I'm not making it well. They have said they're not, that Monsanto said in that contract, that R&J's contractors are not our employees for any purpose. My point being is if they're not employees, they can't be a joint employer. That's what they say. I mean, that opens and shuts the matter of this issue of control, because the opposing counsel brought up this issue of control, and let's assume for a minute that there is. Well, let me ask you this. Did they exercise some modicum of control over these people? Not according to what Mr. Wood and Mr. Carter just said. He said they weren't even there that day, and they didn't manage the day-to-day activities. And I worked well next to my office. But the briefs set forth all the different things. You know, they drop them in there, and they talk to the parents, or they send something. I mean, there's a whole modicum of control. I'm not disingenuous. You know me. I'm not going to argue that they don't have some evidence. Okay? But that's not as a matter of law when they've got a contract that says we're not an employer. No, no. But I think the argument, or maybe I'm mistaken, so let me just ask you my question, and that is if you are a company and you exercise some amount of control over these people and you pay the workers' cut, is that enough? I don't think so. No. No, I don't think. That's his question, Eric. That's his issue is control. It doesn't say control under Section 5. It doesn't say that. And by the way, I'm not, I don't want to mislead you, but I'm not in any way conceding about the issue of control because R and J, both of those high school teachers that started this assessment company, said very clearly we did not relinquish control. So if you accept what they're saying and, you know, liberally construe this, they didn't exercise any control. They're substantial paid people that are coming in here saying, yeah, we exercise some degrees of control. We disagree with that outright. But, no, I disagree with the issue of control. And, Justice, I think you hit the nail on the head when I was embarrassed that I didn't, frankly, create the hypothetical that you asked about the unreasonably dangerous product. That was a great question, and that really proves my point, which I have probably inherently made today, which is if you have somebody that's totally unrelated, and your idea, you know, your hypothetical about the unreasonably dangerous product, that's what we have here. Monsanto said they're not our, what happens to a venture, we're not an employer, they're not our employees, they're not our agents. That hypothetical that you gave, which is not contemplated by the Section 5A, is the fact pattern that we have here. He doesn't have a case. The direct answer and the candid answer is they don't have a case where there's no relationship, and they still went ahead and said the exclusive leverage. I don't, unless I'm mistaken, I did not hear a case, and they don't have a case. Lastly, I do think it's important that we, you know, Mr. LeClerc had this question with this microphone, and I'm getting into Mr. Burss's, that's not the fact pattern here. The State of Illinois didn't testify under oath when I proposed those uncanceled employees. They said, and it's in the record, I asked them, did you voluntarily undertake a duty to go and inspect those fields for safety issues for the field? Yes, the answer was yes. So I don't hear that from the State of Illinois. That's not, you know, so using this hypothetical, it's apples and oranges. I would also point, I disagree with counsel's from comment's position about Martin versus Keeley. Well, since Nye versus Yellow Cab Company, this case is this court's opinion, and Combs and Martin and a plethora of others. If there's disputed issues of fact that have to determine the issue of duty, then it's left in the trier of fact. There's all kinds of cases that say that. I understand that they don't want to embrace that. In this case, if their position is we're a joint employer and that describes the duty issue, fine. But we all seem, even the trial court, who I disagree with in this case, I was just reading his opinion, as to its joint employer argument, this is the trial court, the court agrees with plaintiffs that there are numerous facts which create trial issues for the jury on this theory. He got that right. Just from Chaska, I agree with that. And I've been waxed on for a long time, Justice Berk, about different elements of, you know, they hired an employee to pay them and they couldn't, you know, Monsanto couldn't discharge these employees and couldn't discipline them. But that's all for the jury, and I think we agree on that. Thank you for your time. All right, Mr. Morris. Thank you, Your Honor. Also, actually, not the one you said, but I would suggest that the state of Illinois is aware that this microphone is a dangerous instrumentality, and with a simple phone call. Well, I'm just acknowledging that every day. That's good. Thank you. It was being recorded, too. Thank you, Justice Huffman. I appreciate it. Thank you, Justice Huffman. A simple phone call might have prevented my contact with it. Now, I want to go to two direct issues in response to what Mr. Kutari said. First, Mr. Kutari has made some statements that I think are substantially misleading with respect to how this kind of irrigation system works. You may recall what he said. He said an irrigation system is always in the middle of the field. I want to discuss this briefly. If you're flying a airplane, you look down at the field in the midway and see circles. The reason you see the circles is because the irrigator is in a center channel. That's what they call it. Farmers call it a center channel. And it's parked there. And there's no corn growing in that center channel. It's just a bunch of weeds and grass and mud. And then what happens is the farmer activates the irrigator. The irrigator then begins its circle. That's the circle you see when you're flying over the field in the airplane. And the irrigator makes a full pass in that circle, then returns to that center channel where it comes to rest. It's never, when it works properly, in the middle of the field in the path of these passers. In this case, the irrigator began being attacked. It went just less than three-quarters of a path, or excuse me, just more than three-quarters of a path in that circle when it stopped because of the electrical problems that energized the irrigator. These girls weren't killed at the center pivot. They were killed at the third tower. So he got that part right. He described how the irrigator is comprised of milk and an arc, and then it goes to a tower with two tires, and then what he left out is an A-frame, and there's a pole in between the two tires. Then it goes to a second tower. Then it goes to a third tower. In this case, what happens is at the third tower, far, far away from the center pivot, the third tower that happened to be in the path of these girls as they're walking down the road pulling the remaining passers out of the corn, they encounter this metal pole that intercedes the two tires of that third tower. Jane Garza is concerned with the issue of how does she detach those and stay in her road, which is what she's required to do, and get around this large tower. Why? Well, she climbs over that metal pole that intercedes the two tires, and she's electrocuted. You can hear the screaming sparks are actually coming out of her mouth. Her best friend, Hannah Kendall, is in the row next to her. She grabs her friend, Jane, in order to try to save her, and she's electrocuted and killed as well. So the objective that the irrigator was always in the middle of the field is to ignore the reality that it's never in the middle of the path of these children. But it was that day, which brings me to the next and final point I want to make in rebuttal to what Mr. Kutara said. I stood before this court, I looked you in the eyes, and I told you that Monsanto representatives were in that field prior to the girls being sent into the field. And if they'd opened their eyes, they couldn't have seen this monstrosity, this irrigator, in the middle of the field, in the path of the children, in harm's way. But in my voting counsel, Mr. Kutara told me that there's nothing in the record of the court that can challenge me. You may recall, to cite the record that supports that proposition, I cite to you volume two, pages 4819 and 4820 of the common law record, and I'd like to read just a portion of that to you. Starting at line 19 on page 4819 of the common law record, volume two. Question. You do not deny that you were in the field the day before this. Answer, no. Question, correct. Answer, correct. Question. You do not deny that you were in the field the Saturday before this incident. Correct. Answer, no, I do not. Question. You don't deny that you were in the field the Friday before the incident. True? Answer, no. These questions were posed to Mr. Piercy. Mr. Piercy was a field representative for Monsanto. Mr. Piercy was in the field. By his own testimony, he was in the field the days immediately preceding this incident, the days when with open eyes he could have seen that centipede irrigation system in the middle of the field and it was never before in the path of the Infernal Divinity Chapel. Thank you.  Ms. Howard. Thank you. Council, for Commonwealth Edison, everyone needs to be stated that plaintiffs had the opportunity to submit an amended affidavit before the hearing. They only had the opportunity, plaintiffs only had that opportunity in the sense that they could have sought leave to do so. There was a briefing schedule set that called for plaintiffs to write a brief in our position and for the defendants to write a reply in support. There was no opportunity other than the opportunity to move for leave to amend, which plaintiffs did take advantage of by moving for leave to amend. As Justice Burke pointed out, that request for leave was in the alternative in the case that the court found that the affidavit had a procedural failing, which plaintiffs had argued against. It's noteworthy that the contents of Dr. Patton's affidavit, paragraphs by and set forth, his information regarding how the defendant, Commonwealth Edison, supplied electricity, has never been disputed by Commonwealth Edison in these proceedings. Meaning, Dr. Patton relied on the facts of how Commonwealth supplied his electricity in coming to this conclusion and there is no reason for him to doubt that his understanding of paragraph 5 was correct. Let me just ask one more question. In 5 or 6, paragraph 5 or 6 of Mr. Patton's or Professor Patton's observation, does he in any way address Commonwealth Edison's issue that there may have been a grounding problem but it wasn't our material or our piece of equipment? Not just in paragraph 6, but in paragraph 8 and 9. In paragraph 9, you state, In my opinion, to a reasonable degree of certainty within the field of electrical engineering, that Commonwealth Edison should reasonably foresee that non-installing surge-protective devices and overcurrent devices as described in paragraph 6, could lead to the electrification of equipment drawing power provided by Commonwealth Edison and therefore to the electric shock injury when such equipment was touched. So, he is stating his opinion that, irregardless of the fault, that I believe it has been conceded by other co-defendants, that yes, there was a fault at the irrigator, but Dr. Patton is saying, had these surge-protective devices been installed, that surge would have never reached the non-grounded irrigator. And so, it is approximate cause of the Senate Commonwealth Edison failure to provide these overcharged surge-protectors is approximate cause of the equipment being electrified. So, in certain parts of this case that we don't necessarily have before us, there are other things that have happened. And that somehow reflects that issue? Well, her suggestion is that we all know the cause of the injury was that the irrigator was not grounded. She said that in her argument. No, we don't all know that that is the cause, and further, the evidence has to be extremely reliable, favorable to the defendant, the plaintiff, as to the motion for summary judgment. So, here we have the opinion of an expert that the lack of the surge-protectors is what led to the electrification of the equipment, drawn power provided by Commonwealth Edison, and therefore to the electric shock injury when the equipment was touched. This is a very expansive record. We'll all agree to that. Yes. Does it cover what we have? Does it cover everything that's happened in this case other than possible, you know, settlements out or whatever? Stated for the record. Would we know? Would we know? That surge-protector, that this equipment or property was actually, belonged to Canal Farm, and that Commonwealth Edison is not responsible for that particular piece of equipment from the record we have in front of us? Within the record in front of you, I believe there is at least some testimony of Kevin Larkey that the irrigator was not properly grounded. That said, I would argue that those facts, which would support defendant's factual position, are not relevant at a motion for summary judgment proceeding as to defendant Commonwealth Edison. Who else may have been negligent is not relevant to whether ComEd had a duty. And if it was further relevant to your question, there is no other place in the record other than the affidavit of Dr. Patton that would say failure on the part of ComEd. Well, he says, it sounds like he's saying failure on the part of ComEd to ground their equipment or surge-protect their equipment and cause that failure to go to the property of the Canal Farms or whoever owns that. And so it wouldn't make any difference even if it had been. It would have been challenged because Commonwealth Edison didn't have a surge-protector. That's a pretty significant conclusion to take out of that if we don't have that information. Well, it's based on his... he is a professor of electrical engineering and he was the... The head of Indiana? He was the director of the Electrical Power Institute program within the University of Texas A&M. And he was also for Westinghouse... Worked in the electrical engineering and electrical utility engineering department at the Westinghouse Electric Corporation from 1957 to 1965. And he also performed work as a consultant electrical engineer and a forensic engineer. So this is his statement that without these... that there weren't devices that Commonwealth Edison could have employed that would have prevented the charge from reaching the irrigator at all. Those are issues of material fact. Regarding the defendant's claim that he couldn't have amended the affidavit to cure, the only deficiencies identified were the failure to attach materials, and as I've argued, we refated the precise part of the materials he was relying upon, and whether it was... with his personal knowledge. Citing the Wombs v. Hubs case, which was quoting Burke-Briwell Incorporated v. Washington Bank & Trust, Rule 191 is from the document as a whole. It appears that the affidavit is based on the personal knowledge of the defendant, and there's reasonable inferences that the defendant could confidently testify to its content. So it's not necessary for him to express refate. The following is on my personal knowledge, and I can testify. The rule was satisfied on that point. We felt the rule was satisfied by saying what materials he reviewed, and then stating the facts that he relied upon, but we could certainly have attached those documents that he relied upon, and there is no dispute from Commonwealth Edison that his understanding in paragraph 5 of the affidavit is correct. Thank you, Ms. Howard. Thank you. I'd like to thank all counsel here this morning for the quality of your arguments. The matter will, of course, be taken under advisement. A written decision will issue in due course. Thank you for your time and attention here this morning. We stand adjourned for the day subject to call.